Paul A. FRIEND

v.

Michael J. ASTRUE, Commissioner of Social Security.

Civil Action No. 10–4030.

United States District Court, E.D. Pennsylvania.

April 18, 2011.

Michael Patrick Boyle, Philadelphia, PA, for Paul A. Friend.

Dina White Griffin, Office of the General Counsel, Philadelphia, PA, Eda Giusti, Social Security Admin Office of the General Counsel, Philadelphia, PA, for Michael J. Astrue, Commissioner of Social Security.

*ORDER*

ROBERT F. KELLY, District Judge.

AND NOW, this 18th day of April, 2011, upon consideration of the Plaintiff's Motion

for Summary Judgment, and the Defendant's Motion for Summary Judgment, and after careful review of the Report and Recommendation of United States Magistrate Jacob P. Hart, IT IS ORDERED that:

1. The Claimant's Request for Review is DENIED; and

2. JUDGMENT IS ENTERED in this case in favor of the Defendant.

## REPORT AND RECOMMENDATION

JACOB P. HART, United States Magistrate Judge.

Paul A. Friend brought this action under 42 U.S.C. § 405(g) to obtain review of the decision of the Commissioner of Social Security denying benefits in his claim for Supplemental Security Income, ("SSI"). He has filed a Request for Review to which the Commissioner has responded. For the reasons that follow, I recommend that Friend's Request for Review be denied.

### I. Factual and Procedural Background

Friend was born on July 29, 1955. Record at 110. He obtained a GED. Record at 26. He worked for many years as a chef, and briefly as an inventory clerk. Record at 153. On March 28, 2008, Friend filed an application for SSI, asserting disability since October 17, 2007, on the basis of bipolar disorder, schizoaffective disorder, hepatitis C, and angina. Record at 110, 152.

Friend's application was initially denied. Record at 61. He then requested *de novo* review by an Administrative Law Judge ("ALJ"). Record at 67. The hearing was held on June 4, 2009. Record at 23. On August 27, 2009, the ALJ issued a written decision finding that Friend was indeed disabled. Record at 11. However, she determined that Friend's substance abuse

was a contributing factor material to the determination of disability. Record at 21. Under 20 CFR § 416.935, therefore, she decided that Friend was not entitled to benefits.

The Appeals Council denied Friend's request for review, permitting the ALJ's decision to stand as the final decision of the Commissioner. Record at 1. Friend then filed this action.

### II. Legal Standards

■ The role of this court on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir.1986); *Newhouse v. Heckler*, 753 F.2d 283, 285 (3d Cir.1985). Substantial evidence is relevant evidence viewed objectively as adequate to support a decision. *Richardson v. Perales*, *supra* at 401, 91 S.Ct. 1420; *Kangas v. Bowen*, 823 F.2d 775 (3d Cir. 1987); *Dobrowolsky v. Califano*, 606 F.2d 403 (3d Cir.1979). Moreover, apart from the substantial evidence inquiry, a reviewing court must also ensure that the ALJ applied the proper legal standards. *Coria v. Heckler*, 750 F.2d 245 (3d Cir.1984).

To prove disability, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." 42 U.S.C. § 423(d)(1). Each case is evaluated by the Commissioner according to a five-step process:

(i) At the first step, we consider your work activity if any. If you are doing substantial gainful activity, we will find that you are not disabled. (ii) At the second step, we consider the medical

severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. (iv). At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. (v). At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (references to other regulations omitted).

Moreover, as noted above, in a case involving drug and alcohol abuse, an ALJ who finds a claimant disabled must determine whether the claimant's alcoholism or drug addiction is a contributing factor material to that determination. 42 U.S.C. § 423(d)(2) and § 404.1614(c)(3). If so, the claimant is not entitled to receive benefits. *Id.*

First, the ALJ must decide whether drug addiction or alcoholism is present. If it is, the ALJ must proceed to determine whether it is material to the finding of disability. The regulations provide:

The key factor [to be considered] in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.

20 CFR § 416.935(b) and § 404.1535.

III. *The ALJ's Decision and Friend's Request for Review*

The ALJ determined that Friend suffered from the severe impairments of a schizoaffective disorder, and a substance dependence disorder. Record at 16. She found that these mental disorders met the Listings for Sections 12.04 and 12.09 as set forth in 20 CFR Part 404, Subpart P, Appendix 1, because of his repeated episodes of extended decompensation, i.e., his extremely frequent hospitalizations. Record at 17–18.

The ALJ further determined that, if Friend's substance abuse were to end, he would still have severe impairments, but that they would not meet or equal a listing. Record at 19. She stated that, absent his substance abuse, Friend would retain the RFC to engage in light work which was limited to routine, repetitive, short and simple tasks. Record at 20. Although he could no longer work as a chef, he could return to his prior work as an inventory clerk. Record at 21. For that reason, even though Friend was disabled, his substance abuse was a material factor in his disability, so that he was not entitled to benefits. Record at 21.

In his Request for Review, Friend argues that the ALJ erred in finding that his substance abuse was material to his disability. He argued that she could not reasonably have determined that he would be able to work in the absence of his substance abuse, since the record revealed no prolonged periods of abstinence in which his condition could be evaluated.

Friend also maintains that the ALJ erred in deciding that, in the absence of substance abuse, he could return to his former job as an inventory clerk.

## IV. *Discussion*

### A. *Friend's Substance Abuse*

■ The first requirement of 20 C.F.R. § 404.1614(c)(3) is not in issue, because it is not disputed that Friend has been addicted to both drugs and alcohol for many years. The issue is whether, if Friend were to cease using drugs and alcohol, he would still be disabled. The ALJ decided that he would not. Record at 19. She reasoned that the factor causing Friend to be disabled was his frequent hospitalizations, which she characterized as episodes of decompensation, each of extended duration. Record at 18, *and see* Listing 12.04. Then, she concluded that Friend would not experience these episodes of decompensation if his substance abuse ended: "This is evidenced by the absence of any hospitalizations without drugs/alcohol being involved." Record at 19. She emphasized this: "To restate, all hospitalizations took place with the involvement of drugs/alcohol as a factor." *Id.*

This appears to be true, and even something of an understatement, as many of the hospitalizations appeared to be for the specific purpose of obtaining drugs. There are records of 35 different hospitalizations between the years of 2002 and 2009. Record at 187, 193, 196, 2002, 208, 216, 228, 233, 279, 340, 354, 365, 456, 460, 466, 546, 553, 607, 610, 638, 685, 730, 736, 791, 806, 843, 848, 923, 944, 971, 1061, 1069, 1134, 1163 and 1325. Around 15 of these took place in the relevant period, after October, 2007.

The majority of Friend's hospitalizations were voluntary admissions to mental wards. Record at 187, 193, 196, 202, 216, 340, 354, 365, 456, 460, 546, 736, 971 and 1163. Others were mental hospitalizations or detoxification that immediately followed presentation to the emergency room with complaints of chest pain. Record at 208, 228, 233, 279, 610–638, and 791. Still other admissions were for chest pain alone. Record at 466, 553, 730, 843, 848 and 994.

Friend consistently stated upon admission to a mental health program that he had suicidal ideation about hanging, or had recently tried to hang himself. Record at 202, 228, 233, 279, 354, 365, 460, 736, 923, and 1163. He would often also claim to have homicidal ideation involving shooting his wife. Record at 193, 365, 456, 460, 736, 971 and 1163. During hospitalization, Friend would generally receive medication, frequently Seroquel, or the benzodiazepines Klonopin and Ativan. Record at 202, 208, 216, 279, 365 and 736.

Eventually, hospitals began observing drug-seeking behavior. As early as September, 2003, a mental health practitioner noted that Friend kept complaining of hearing voices "although it wasn't really clear that he was actually hallucinating", and that "he did say that the Seroquel medication really helps him and he wanted more and more of it." Record at 457–458.

In September, 2006, records it was noted that Friend "was demanding medications and stated that he was in pain." Record at 462. Also noted—although Friend claimed he had tried to hang himself on a ceiling fan, there was no evidence of any injury, nor was there a visible mark around his neck. *Id.*

This drug-seeking behavior became even more pronounced in the period relevant to Friend's claim. During a mental hospitalization between November 29 and December 4 of 2007, he requested Seroquel. Record at 549. Then:

The use of benzodiazepines in the setting of continued substance abuse was

discussed with him ... Again it was recommended that he not remain on benzodiazepines.... Over the weekend, the patient then became very angry and demanding. He insisted he needed Klonopin for anxiety. He complained of chest pain and requested opiates for pain. He demanded transfer to the emergency room or a medical hospital for treatment of pain of his elbow as well as his chest pain. His EKG was found to be unchanged from previous EKGs. He was [told that his chest pain] would need to be treated with Motrin or Tylenol. He patient stated that he no longer wished to remain in the hospital and wanted to leave immediately.... Also, he became angry when he realized he was not going to be given opiates for pain or ongoing use of benzodiazepines. He said that he was no longer depressed.... The patient was taken to court ... he was discharged against medical advice.

Record at 550–551.

In December, 2007, Friend was apparently denied inpatient services after his insurer reported to the hospital that he was dependent on "benzo." Record at 610. Friend was described on that occasion as "very demanding, constantly asking for medication." *Id.* He was angry when he heard about his insurer's refusal to approve a hospitalization, and "stated he was going to go to another hospital." Record at 637.

On January 26, 2008, Friend presented to an emergency room, complaining of chest pain. Record at 791. Once there, he attempted to wrap an EKG cord around his neck. *Id.* He was given Ativan and sent for mental health treatment. *Id.* At the mental hospital it was noted that "there was no clear evidence of an Axis 1 disorder other than substance abuse." Record at 793. Friend "insisted that he

was in withdrawal and needed benzodiazepines." Record at 792.

Between August 1 and 4, 2008, Friend was treated for what was described as "cocaine induced" chest pain. Record at 843. He was placed on morphine, but "was with drug seeking behavior", insisting that his Ativan and Seroquel be increased. Record at 843–844. When the doctor refused, citing concern for his respiratory drive, Friend decided to leave the hospital. Record at 844. Similarly, Friend was treated with dilaudid (morphine) for chest pain on September 5, 2008. Record at 806. "Once the IV dilaudid was stopped, the patient was anxious to leave the hospital." Record at 807.

On November 30, 2008, Friend presented himself to a mental hospital, complaining of depression and suicidal ideation involving hanging himself. Record at 923. His insurer notified the hospital that "the patient was red-flagged as a patient who frequently sought hospitalization, and that he was manipulative in that way." *Id.* The hospital was also told that there was "no substantiation that he had ever made a suicide attempt." *Id.* The discharge summary then reports: "When confronting the patient with this, he did not deny that that was the case." *Id.* He was discharged back to the recovery house where he had been living. *Id.*

On November 14, 2009, after several other hospitalizations, Friend was again denied coverage by his insurer for inpatient mental care. Record at 1140. His insurer's representative told the hospital: "Said patient must not be admitted for any level of care." Record at 1140. The insurer's doctor said that Friend "has multiple presentations with similar claims of depression and suicidal ideation ... Marital issues are always brought up." Record at 1241. When a doctor pointed out to Friend that he had been complaining of

depression because of his wife divorcing him since the year 2000, Friend "became angry and stated 'she stopped that years ago and we got back together.'" *Id.* Friend was then told he would need to obtain a prescription from his detox program for medications. *Id.* He said: "If I'm not getting my meds I might as well leave." *Id.*

Nevertheless, Friend was admitted to a hospital on February 12, 2009, after overdosing on Ativan and Restoril pills. Record at 1163. Although the overdose did not injure him, he appeared to be suffering from DT. Record at 1173.

Clearly, the ALJ's observation that all of Friend's hospitalizations were connected to drug and alcohol use is supported by substantial evidence. Indeed, the evidence is overwhelming. Friend has received mental health diagnoses upon each hospitalization, most frequently of major depressive disorder with psychotic features, but his Axis 1 diagnosis always included his substance abuse disorders as well. Record at 187, 193, 196, 202, 209, 218, 228, 233, 342, 254, 367, 457, 463, 471, 548, 736, 792, 848, 924, 1152 and 1177. He has even received diagnoses and "rule out" diagnoses of substance-induced mental disorders, suggesting that he might not have a mental disorder if he was abstinent. Record at 193, 342, 457, 792 and 1177.

Friend, however, maintains that he is entitled to benefits. He points to this section of an internal Social Security Administration Memorandum:

We know of no research data upon which to reliably predict the expected improvement in a coexisting mental impairment(s) should drug/alcohol use stop. The most useful evidence that might be obtained in such cases is that relating to a period when the individual was not using drugs/alcohol. Of course, when evaluating this type of evidence consideration must be given to the length of the period of abstinence, how recently it occurred, and whether there may have been any increase in the limitations and restrictions imposed by the other mental impairments since the last period of abstinence. **When it is not possible to separate the mental restrictions and limitations imposed by DAA (drug addiction or alcoholism) and the various other mental disorders shown by the evidence, a finding of "not material" would be appropriate.**

Emergency Teletype–96, August 30, 1996, answer to Question 27. (Emphasis supplied by Friend).

Friend writes: "In the instant case, there do not appear to be any prolonged periods of abstinence from drug or alcohol abuse. Given that, there is no way for the ALJ to 'separate the mental restrictions and limitations imposed by DAA and the various other mental disorders shown by the evidence.'" Memorandum In Support of Friend's Request for Review, at 12–13. Therefore, a finding of "not material" would be appropriate, he claims.

It is unthinkable that Emergency Teletype–96 was intended to convey to agency employees that a drug addict or alcoholic can bypass 20 C.F.R. § 404.1614(c)(3) by the simple expedient of always remaining high. For this reason, I cannot accept Friend's interpretation of the memorandum. Doubtless, evidence of the claimant's condition during a period of abstinence is "the most useful evidence." However, where it is not available, Emergency Teletype–96 does not prevent an ALJ from turning to the evidence which is available, and seeking other sources if the record is insufficient.

In this case, the ALJ's conclusion that Friend would not be subject to repeated

episodes of decompensation but for his drug and alcohol addiction is essentially an inference, but it is a very well-supported inference.[1] The medical record discussed above leads inescapably to the conclusion that Friend would have far fewer—if any—hospitalizations in the absence of drug and alcohol abuse. Thus, the ALJ's decision that 20 C.F.R. § 404.1614(c)(3) precludes Friend from receiving benefits is supported by substantial evidence.

## B. Friend's Past Relevant Work

█ Friend's second argument is that the ALJ erred in concluding that he could return to his past relevant work as an inventory clerk. He points out that, according to the Dictionary of Occupational Titles ("DOT"), the position of inventory clerk requires Level 3 reasoning skills, which requires the worker "apply common-sense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and "deal with problems involving several concrete variables in or from standardized situations." This, Friend claims, is inconsistent with the ALJ's finding that (in the absence of substance abuse) he could only perform routine, repetitive, short and simple tasks. Further, the DOT also states that the job of inventory clerk is performed at a medium exertionary level. The ALJ found that Friend could only work at the light level.

These differences between the DOT and the ALJ's RFC findings do not render the ALJ's conclusion faulty. To be found able to perform his past work, a claimant can *either* be found capable of performing it (a) as it was actually performed in the past; *or* (b) as ordinarily required by employers,

as specified in the DOT. SSR 82–61. Clearly, the two can differ.

In this case, Friend testified that—as he actually performed the job—work as an inventory clerk involving some sitting, and some standing, and that: "What I would actually do is go throughout the store and they had a gun, handheld gun-like device and you just point it at the shelves and it would tell how much was on the shelves." Record at 28. He had nothing to carry besides the gun-like device, and he did not stock the shelves. *Id.*

The vocational expert who testified at Friend's hearing specified that, while "the inventory clerk is semi-skilled and medium in the DOT", it was "unskilled and light" as performed. Record at 41, 42.

Friend maintains that, under SSR 00–4p, a vocational expert's testimony cannot be relied upon where there is a discrepancy between that testimony and the DOT. This is a faulty reading of that ruling. The ruling actually requires the adjudicator only to "elicit a reasonable explanation for the conflict before relying on the VE [vocational expert] evidence to support a determination or decision about whether the claimant is disabled." Here, the vocational expert clearly noted the discrepancy, and reasonably explained that his evidence differed from the DOT because it relied upon Friend's own testimony.

As the ruling notes:

Neither the DOT nor the VE ... evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE ... is reasonable and provides a basis for rely-

---

1. Friend has not disputed the ALJ's finding that he suffers from only mild or moderate impairments in his other areas of mental health-related functioning, so that his fre-

quent episodes of decompensation are the sole basis for the finding of disability. Record at 19.

ing on the VE ... testimony rather than on the DOT information.

SSR 00–4p.  In this case, the vocational expert's explanation was obviously reasonable, given Friend's testimony, as cited above.  The ALJ was well justified in relying upon it.

### V.  *Conclusion*

In accordance with the above discussion, I make the following

### RECOMMENDATION

AND NOW, this 24th day of March, 2011, it is RESPECTFULLY RECOMMENDED that Plaintiff's Request for Review be DENIED and that Judgment be entered in this case in favor of the Defendant.